LOTTINGER, Judge.
This is a suit by John Louis Bernard and his wife, Mrs. Violet C. Bernard, against Mrs. Gertie F. Stephens for damages resulting from an altercation between his wife and Mrs. Stephens. All of said damages are for personal injuries. Petitioner, Mr. Bernard, claims damages on behalf of his minor child who was injured during the altercation, for his own mental pain and suffering, and for expenses and doctor bills incurred by him as master of the community of acquets and gains. Mrs. Bernard sues for humiliation and pain and suffering resulting from the injuries to herself. A reconvcntional demand was filed by defendant. Upon trial below, the court held that neither party proved his, or her, demand and, therefore, the principal action, and the demand in reconvention, were dismissed at petitioners’ cost.
The altercation took place on November 9, 1950, in the City of Baton Rouge, Louisiana, at a furnished apartment belonging to defendant but rented to petitioners. At the time of the incident, petitioners were in the process of moving from defendant’s apartment, and defendant appeared upon the scene to determine that everything was in order, and to see that none of her furniture was damaged. There is a great divergence in the testimony given by the parties as to what actually took place immediately prior to and during the affray.
Petitioners claim that Mrs. Stephens, without cause or provocation, slapped Mrs. Bernard while she, Mrs Bernard, was holding her three month old baby in her arms; that, thereafter, defendant struck the baby with its nursing bottle; and then, after breaking the bottle on a chair, hit Mrs. Bernard in the head with the bottle. The evidence shows that the baby received a blow to the head. While the evidence indicates that some broken pieces of glass were found in Mrs. Bernard’s hair, she only suffered minor scratches to the scalp. The defendant, on the other hand, denies that she slapped or struck Mrs. Bernard until after Mrs. Bernard had hit her on the head with the baby bottle. Defendant admits that, after she was struck with the bottle, she struck Mrs. Bernard on the head with her car keys, but denies that she ever struck the baby. Mrs. Bernard admits striking defendant with the baby bottle, knocking defendant down, and the evidence shows that defendant suffered a cut on the head requiring several stitches.
*772 The baby received a depressed fracture of the right frontal region of his scalp. An operation was required to elevate the depressed region. Normal recovery was experienced by the child, but the injury did leave a scar which; according to the doctor’s testimony, is nondisfiguring. The doctor stated that it is reasonable to assume that no residual effects from the depression will ever be experienced. Mrs. Bernard only received minor scratches to her head, and Mrs. Stephens received a severe cut in her scalp requiring several stitches.
There were no eyewitnesses to the affray other than Mrs. Bernard, her baby, and Mrs. Stephens. Petitioners, however, did introduce as witnesses several of their neighbors whose testimony was of little value except to corroborate the fact that there was a fight and that Mrs. Bernard and her baby were in an extremely nervous condition immediately after the affray. They further testified to the injury to the child and the pieces of glass found in Mrs. Bernard’s hair and scratches to her scalp. They further testified that they saw blood on the front of Mrs. Bernard’s blouse which could have well come from the gash of Mrs. Stephens’ head, the only place from which any substantial amount of blood was drawn.
The lower court, after a well reasoned and somewhat lengthy opinion, rendered judgment dismissing both the main demand and the demand in reconvention on the grounds that neither party had sustained the required burden of proof. Petitioners have taken this appeal.
Both Mrs. Bernard and Mrs. Stephens admit administering blows upon the body of the other. Mrs. Bernard admits striking 'Mrs.' Stephens with the baby bottle. Mrs. Stephens on the other hand admits striking Mrs. Bernard with her car keys. Each emphatically denies having struck the baby, and they each deny 'having struck the first blow.
Mrs. Bernard’s version of the affray is as follows:
“A. When she started to go out the room at my front door I told her to come back and Johnny would pay her the money for the lamp shade. She said, ‘Don’t mention Ihis name again or I’ll slap you,’ so when she started to leave I told her Johnny would be back in a few minutes, if she wanted to wait he would pay her. Then she forced her way back in and slapped me in the face four times and was going to slap again when I picked up the baby bottle and struck her.
“Q. When she hit you did she knock you down? A. Yes sir, on the bed. We were right by the door.
“Q. Where was the baby bottle you picked up? A. It was on my left side of the bed.
“Q. Were you holding your baby all this time? A. Yes, sir, I was. I was afraid to lay him down if I lhad had room to.
“Q. After you hit Mrs. Stephens what happened? A. I just stared at her for a minute then she jumped up and ran toward my kitchen and there was a cut over her eye. I was afraid she would do something dangerous if I stayed in the house so I ran out on the porch. Before going out I laid the bottle down on the bed and I ran out on the porch. All this time I had been calling for my neighbors.
“Q. Who were your neighbors? A. Mr. and Mrs. Young next door.
“Q. What was her first name? A. Olivia.
“Q. Go ahead. A. They didn’t answer the door when I knocked. Soon Miss Gertie came out and started striking me. I didn’t know what she had in her hand. She didn’t have anything at the time. I couldn’t see anything when I turned around, in her hand. She ran back into my apartment and when she came back she had the baby bottle. I don’t remember if she hit me with the bottle or not, but I know I was holding the baby, and when I turned around she struck and hit him over his eye. I felt him stiffen out. I was still calling for Olivia. When I looked down the baby didn’t have any blood on his face and I couldn’t tell where she had hit him until we were in the light. Right after she hit the baby she broke the bottle and began cutting me with downward strokes into my head.”
*773 Mrs. Stephens’ version of the affray is as follows:
“Q. The night of September 9th will you tell the court what (happened that night? A. Well, the Bernards were renting this apartment from me, and just about a week before this happened I was visiting with the Youngs on the other side. While I was there Mrs. Bernard asked me over. Then I went there for a few minutes. While I was there I saw that my walls and my furniture were being scratched from moving it around.
“Q. Is that a furnished apartment? A. Yes, sir.
“Q. Go ahead. A. So I asked Mrs. Bernard to wait until Mr. Bernard would be home to help her move the furniture. Well, then, just about a week later Mrs. Bernard called me and told me she had found an apartment that day and she was moving out the very next day. I told hei she wasn’t giving me very much time and that I could demand a whole month’s rent, so she told me she was moving regardless and started arguing, so I just ignored her and hung up. Then just a short while,— that -same day, she called me back and I told her that I would rather talk to her husband. She told me he wasn’t at home and to come back late that afternoon, so I left my home about 6:30, went over there and Mr. Bernard was at home.
“Q. You remember what date that was? A. I think it was the 8th.
“Q. Go ahead. A. And they had a couple there, some company, and we all sat in the dining room so I told Mr. Bernard my reason for being there and told him if he would give me about a week’s rent that it would be all right, I would give him a receipt for it. He agreed. With that I proceeded to leave and the wife to the couple that was there said I was just taking advantage of Mr. Bernard and that that wasn’t right, and her husband jumped up and said that it was just the principle of it, taking John’s money, Mr. Bernard. Then I left, — -I got up to leave and Mr. Bernard went to the front door with me and Mrs. Bernard stayed with the company in the dining room. Now the next night, — I am sorry, — so when the couple told me that, I asked Mr. Bernard if he was satisfied or if he would rather not accept the receipt'and he said he was satisfied, and that’s when he walked to the door with me. Well, then, the next night was the night they were moving, so I wanted to see how they were going to leave my apartment, so when I went over and when I got there I knocked on the door and Mrs. Bernard opened the door, received me with the baby and the baby bottle in her hand, so I told her I had just come to see how things were, and she told me just to go on through, so I walked to the back and saw that my big blue shade hanging over my dining room table was missing. I asked Mrs. Bernard what had happened to my big blue shade. She told me it was broke and could not be fixed. I told her that would be all right but I just hoped to find the rest of my apartment as it was then, so I walked out on the porch, — and I only have one screen door. She lived on the south side and the door is on the north side. Well, she followed me to the door with the baby and the baby bottle in her hand. She never put it down and before I knew it I was struck with the baby bottle and it broke right by the screen door. Well, she went to screaming as soon as she bit me and she called the little lady next door, but she didn’t answer the door, so then she ran out the screen door, went to the neighbors and I walked back inside, got something to wipe my forehead with, — it was bleeding, — and by that time she asked me if I wanted to wait for Mr. Bernard and I told her it wouldn’t be necessary, they were packed and ready to leave. That was right after she struck me with the bottle, so Mr. Bernard came in and asked me about his wife and I told him they had had an accident.
“Q. Let me interrupt you. Let’s get back to the time she hit you with the bottle. What did you do when she hit you with that bottle? A. When she hit me with the bottle I was stunned for a minute, so I hit her two or three times on the head.
“Q. What did you hit her with? A. My car keys.
* * * * * *
*774 “Q. When she hit you did the bottle bréale? A. Yes, sir.
“Q. What did she do then? A. She went through the screen door and ran to the neighbors.
Neither the above testimony of Mrs. Bernard nor that of Mrs. Stephens is corroborated by the testimony of the other witnesses. Some of the neighbors testified that they heard the screaming and commotion, but none of them saw the actual affray, nor could they tell how or why it started.
Petitioners claim that the baby was struck by Mrs. Stephens with the baby bottle. It appears to us that if such were so, the baby would have received a far more serious injury than what it actually suffered. The baby was of tender months — three to be exact. A blow on the head of such a child with a bottle, would in our opinion either be fatal, or of such serious consequences as to crush the head. From the medical testimony adduced, it appears to us that a relatively slight blow was struck the baby, which, because of the tender age, would easily cause the depressed skull which the baby suffered. This slight blow could have been caused when Mrs. Stephens struck Mrs. Bernard, as she admitted having done. On the other hand, the injury to the child could have just as easily been caused by its own mother when she struck Mrs. Stephens with the bottle. Mrs. Bernard admitted holding the baby in her arms when she struck Mrs. Stephens, and the injury to the baby might well have been inflicted when the blow was struck by Mrs. Bernard. From the wide divergence of testimony of the parties, we are unable to reach any reasonable conclusion as to who caused the injury to the child. However unfortunate the injury to the innocent child might be, it is, nevertheless, our opinion that the lower court was correct in dismissing this portion of petitioners’ claim, and we certainly cannot find any manifest error which would justify our reversing the lower court.
We believe the same would hold true for the remainder of petitioners’ claim. Each party denies having struck the first blow. We are unable to ascertain which party was the aggressor. It appears from the record that some ill feelings had existed on the part of the parties prior to the affray, especially on the part of Mrs. Bernard. As to the claim by Mrs. Bernard that pieces of broken glass were found in her hair after the affray, which claim is corroborated by witnesses, we are of the opinion that such was so but we do not believe that they got there by Mrs. Stephens’ hitting Mrs. Bernard in the head with the broken bottle. Had Mrs. Bernard’s version of the incident been true, we believe that she would have been seriously cut in the head, and the injuries would have been much more serious than the few scratches which the record shows. We do not believe that “bobby” pins would have prevented serious cuts, as is claimed by Mrs. Bernard. Furthermore, it might well be that Mrs. Bernard was the aggressor, as she admitted hitting Mrs. Stephens with the bottle, prior to the alleged attack on Mrs. Bernard with the broken bottle. We are unable to reach any reasonable conclusions as to which party was the aggressor, and, neither party having sustained the burden of proof required by law, we are of the opinion that the lower court was correct in dismissing both the main action and the demand in reconvention.
 The prevailing rule in our jurisdiction is that appellate courts will not reverse trial courts unless the trial court was clearly erroneous in its findings. From our review of the record in this proceeding, we are unable to determine any error whatsoever in the findings of the lower court. The burden was on each party to prove its claim by a preponderance of the evidence. This burden was not sustained by either of the parties. Furthermore, the record does not disclose such error on the trial court 'which would justify a reversal of its judgment.
For the reasons- above given the judgment of the lower court is affirmed, the costs of this appeal to be paid by appellant.
Judgment affirmed.